I'm Jeff Hawes along with Bruce Murchison and Neal Zintek. Students are recent graduates of the University of Arizona College of Law under the supervision of Dr. Jordan Curtis on behalf of the appellant Laurie LeClair, whose presence we'd like to note in the courtroom today. This case presents two issues, Your Honors. And with the court's permission, I will address whether the ALJ applied the proper legal standard in dismissing Ms. LeClair's treating physician's opinion as to her limitations. And with that, I'll turn it over to Dr. Jordan Curtis. And Mr. Murchison will address the ALJ's treatment of Ms. LeClair's subjective complaints. And we'd also like to reserve four or five minutes for Mr. Zintek's rebuttal. This is a case about a 48-year-old woman who has had both of her hips replaced, has degenerative disc disease, has osteopenia, peripheral neuropathy, carpal tunnel syndrome, depression, anxiety, and PTSD. And yet she was still denied disability and supplemental security income because the ALJ ignored the opinion of her treating physician, which was entitled to controlling weight. What do you mean he ignored it? Well, he gave it almost no, almost no, he threw the opinion out essentially. He did discuss it. He analyzed it. He didn't just throw it away. I mean, he indicated why he wasn't going to credit it. And he didn't credit it, and he did that inappropriately. The proper standard here is her opinion is entitled to controlling weight. What do we make of the fact that he found her not credible? Well, that falls into his analysis, certainly. But Ms. LeClair's credibility is not relevant to the determination of her doctor's opinion as to her limitations. Well, counsel, with respect, isn't the standard clear that the treating physician's analysis can be discredited or less valued if the medical evidence in its totality suggests something quite different than what the physician says? In other words, the physician's diagnosis is not backed up by the other evidence, and it appears secondarily to rely almost totally on the subjective complaints of the patient. Isn't that the correct legal standard? That's correct, Your Honor. But the problem here is that it is entitled to controlling weight, and the entirety of the record supports Dr. Easton's opinion. The ALJ focused on these isolated incidents that he construed to controvert Dr. Easton's opinion, incidences prior to her hip dislocation where she was a little bit more mobile. In addition, even if the ALJ properly determines that the treating physician's opinion is not entitled to controlling weight, it's still entitled to deference. And in that deference, the ALJ has a duty under Brown v. Heckler to fully and fairly develop the record, and he didn't do that in this case. He didn't use his power to either question Dr. or submit questions to Dr. Easton or subpoena her to bring her in to figure out what the full basis of her opinion was. He dismissed it out of hand. I'm not sure if you're supposed to talk about this part of it, but where does the record provide objective evidence to support Dr. Easton's complaint, to be specific? Where does the record show that Ms. LeClair had carpal tunnel or other limitations to her left wrist? What objective tests explain the environmental limitations Dr. Easton imposed on her? Well, and I'd like to address that, because the examining physician who conducted the electrical tests on her for carpal tunnel determined that there was carpal tunnel, electrical evidence of carpal tunnel in her right wrist. But there was no electrical evidence of carpal tunnel in her left wrist. He didn't determine that there was no symptoms of carpal tunnel. He only determined that there was no electrical evidence of radiculopathy or plexipathy. Was there any? Well, the doctor who conducted that didn't determine that there was no other evidence, but the ALJ made a medical conclusion that there was none. He had a responsibility to fully and fairly develop the record and look into the full basis of Dr. Easton's opinion, which he didn't do in this case. The other issue seems to be that the treating physician's opinion failed to take into account your client's, I'm quoting, improvement in functional capacity in the hips, including range of motion. What's your view on that? Well, what the ALJ is citing to is her improvement after her hip replacements. But subsequent to that hip replacement and subsequent to the improvement, she had a dislocation of her hip, and she now has a screw protruding into the tissue around the replaced hip. And that wasn't taken into consideration by the ALJ. He looked at these isolated incidences prior to other problems occurring and determined that those controverted Dr. Easton's opinion. Excuse me, counsel. Did the post-surgical problem to which you've just made reference occur subsequent to the time that the ALJ made the determination with respect to the weight that would be accorded to the primary physician's opinion? I'm not sure I understand what you're saying. In other words, did the screw protruding into the surrounding tissue, did that occur after the ALJ had made the determination that the primary physician's opinion would be given less weight? No, this is all prior to the ALJ's determinations, yes. In addition, under the Smolin case, the ALJ has a duty to use his authority to fully and fairly develop the record. He's not just an umpire here. He has to try and figure out the basis of the facts here in the case for both sides, for the administration and for the claimant here. And he didn't do that. And for those reasons, we'd ask that the Court find that the record as a whole supports Dr. Easton's opinion, and that incorporating that opinion into the vocational expert's opinion, Ms. LeClaire was not employable in the national economy. And we'd ask that this Court grant Ms. LeClaire her benefits or, in the alternative, to remand to the ALJ for proceedings consistent with the law. Thank you. Thank you, Mr. Hawes. Good morning, Your Honors. My name is Bruce Murchison on behalf of the appellant, Lawyer LeClaire. I will speak for about four or five minutes and reserve the rest of the time for Mr. Santek. The ALJ failed to give sufficient weight to Dr. Easton's opinion because he applied the wrong standard. As Your Honors pointed out, that there has to be, when there is to reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing evidence or reasons that are supported by substantial evidence. Unless the ALJ makes a fine of malingering based on affirmative evidence, he or she may only find an applicant not credible when making specific affirmative evidence. And specific findings as to credibility and stating clear and convincing reasons for each. The problem here, Your Honors, is that, you know, the Court said, you know, they said in Burnell, Congress clearly meant that as long as pain is associated with clinically demonstrated impairments, credible pain testimony should contribute to determination of disability. Now, Dr. Easton's opinion was not given not only to a controlling weight but very little at all. And while even the doctor's opinion is not given that controlling weight, the whole record needs to be examined. As Mr. Hawson mentioned, it has to be developed fairly and fully. What do we do with the fact that the ALJ found your client not credible? Well, Your Honor, the ALJ pointed to some isolated incidents. For instance, they said that she was seen outside smoking a cigarette unsupported. She was seen walking without her walker down the hallway. This does not controvert the opinion of Dr. Easton who said she could have up to 20 minutes of unsupported, you know, walking or standing. There was also some discrepancy in why she was no longer working, wasn't there? I beg your pardon, Your Honor? Wasn't there a discrepancy? She told somebody she lost her job not because of her disability but because of some legal issues? Your Honor, the very nature of her degenerative disease, it was getting worse. And she had given some issues with, I believe, a driving issue. But her condition was deteriorating at the same time. No, my point is the ALJ focused on what looks to be an inconsistency in her story to discredit her. I understand, Your Honor. Your Honor, there are several instances of Ms. LeClair's testimony where she is giving and expressing what happened with a, I believe what you're referring to as the driving issue. Is that what you're referring to, Your Honor? She lost her job due to pending fines, felony fines. Correct. And at the same time, her condition was deteriorating, so she was unable to return either way. So it would have, it was not. Okay. But, I mean, that bolsters an adverse credibility finding if you tell one person one story and there's actually another story, doesn't it? Well, Your Honor, if you, depending on the circumstances of what you're discussing, the frame of reference is possible to give two separate stories that overlap. In this case, while she was talking about she was having these legal issues, the same time her condition was deteriorating, even if she was able to take care of those legal issues, it wouldn't have made a difference because she would have been unable to work anyway due to her condition. You agree, I gather, that your client bears the burden of proof here, right? Absolutely, Your Honor. Go ahead. I was going to say, there's no question that your client has some significant medical issues, no question about that. But as you know, Congress, in its wisdom, has made the Social Security Disability Regimen extremely difficult to comply with. And one of the concerns I have here in this case is that Dr. Easton's opinion was filled with what lawyers would call conclusory material with very little backup in the medical record. Not the first of these cases we've seen, but given our Thomas case, how can we give more credit, more weight to Dr. Easton's opinion, given the way Dr. Easton's opinion was written, particularly in the conclusory allegations? Certainly, Your Honor, Dr. Easton was Ms. Clair's treating physician for a little over two years. Right. And so she was familiar with the issues that Ms. Clair was going through. And she had seen a center for MRIs and X-rays, and these did show diagnostic evidence of degenerative disc disease and so forth. Certainly, if the ALGA did not believe there was enough evidence, he had an obligation to develop the record more fully. Apparently, he could have. It's his obligation? Yes, Your Honor. In fact, I believe it was in either Hepler or maybe it was Target, I apologize, where he has the obligation to look at both sides and be able to develop it. He could have suspended the hearing, could have called in Dr. Easton, asked her follow-up questions to say why is this medical evidence not discussed in your opinion. So your view is that the ALJ has the obligation to develop the record, not the petitioner? Well, the ALJ has the obligation to develop it to a fuller standard. If he does not see if there are questions pending as to why something wasn't there. The ALJ has an obligation, does he or she not, to look at the evidence that's presented by the petitioner and whatever may come from the government, analyze it fairly, determine whether there is evidence provided by the petitioner, petitioner's physician, look at the countervailing evidence and make a determination. Isn't that what's going on here? There's no obligation on the part of the ALJ to solicit this information, is there? Well, the ALJ's obligation is to, again, develop the record more fully and fairly. Analyze the record, but not to develop the record, is it? I believe that there is a case law that says, I think I'm pretty certain it's Smolin, and I apologize if I have the wrong one there. But there is both a case law and the CFR that talks about the ALJ's obligation to look at both sides fairly. I get that. I get that. But what I'm understanding you to say is let's assume that a case is not going well for a petitioner, and the ALJ thinks, I can't support an award here, but let me call a few witnesses. Let me get this doctor here, and let's get some more evidence to see if I can fill out the record. Is that what you're suggesting? What I suggest, Your Honor, is that if there were substantial questions, it's like I see this, but there's something missing here, something not quite right. I need a more fully developed record to make the decision. Then you have the obligation to ask Dr. Easton. And what's the case, again, that you're relying upon for that proposition? It is Smolin. Smolin. I want to make sure you leave some time for your colleague. Yes, Your Honor. I have a minute left. If there are any other questions, I would like to. I guess not. Thank you. Thank you. Good morning. Good morning. May it please the Court. I'm Dan Burrows. I'm a special assistant U.S. attorney in the District of Arizona. I'm here to represent Carolyn Colvin, the acting commissioner of Social Security in this case. Could you speak into the microphone? Yeah, no problem. Let me. That's better. As I listen to the argument that occurred there, there were a lot of things that came out that I am not prepared to argue because they were not raised in the appellant's brief at all, particularly this issue about development of the record. Now, I am generally familiar with Social Security law, and I can't concur that the ALJ has a limited duty to develop the record. However, that duty only extends to the point of developing the record so much as he has enough information to make a determination. That absolutely does not mean every time there's something that's contradicted in the record that the ALJ has to search things out. I mean, it was suggested that the ALJ throw out subpoenas. I'm not even sure an ALJ has subpoena power. But certainly the burden of proof is on the Social Security claimant. So just because there's a contradiction in the record, the ALJ is not, under any case law or regulation that I'm aware of, required to resolve that discrepancy. He can absolutely determine that discrepancy against the claimant because ultimately it's the claimant's burden of proof. And were it otherwise, wouldn't that make the ALJ an effective advocate as opposed to a neutral decision-maker? I think that's correct. And particularly in this case, I mean, Social Security proceedings are not adversarial proceedings. It's the claimant and the claimant alone who comes in and brings their evidence before the ALJ, and then the ALJ reviews that evidence in terms of whether it shows the person is disabled. I will say there was something that struck me as I was preparing for this case. I mean, that is that the appellant in her briefs repeatedly says, oh, we have to look at the whole case record. You can't rely on one small portion of evidence. But those statements are really irony in its most literal literary definition, in that if you look at the claimant's argument, that's the exact opposite of what she really wants this court to do. What the claimant wants the court to do is focus on a single doctor's opinion in a record that is over 1,400 or 1,500 pages long. A single doctor's opinion spans three pages. And even then, she wants you to focus on only the period of time after a February 2011 alleged, and this is important, alleged dislocation for which there are no medical treatment records and for which the only evidence is the claimant's own assertion that she dislocated her hip and allegedly went to the hospital. But again, the burden of proof is on the claimant. She's presented no actual records of treatment for a dislocated hip. Well, what do you make of the fact that the AOJ found her not credible? As I read the record, and correct me if I'm wrong, opposing counsel did not appeal that finding. Is that correct? That's absolutely correct, Your Honor. I think that's telling. I think that's very damaging to the case. This is a case where, again, the hip dislocation was alleged, alleged by a person who has a history of welfare fraud, lied about why she lost her job, lost her job due to a criminal matter, not because of her disability situation. Now, they've suggested, well, these were kind of interlinked. Insofar as you can have multiple interpretations of the record, the court is required to accept the interpretation that the AOJ and the agency put forward, and that is that she lost it due to her criminal record, not due to her physical condition. Also, a person who has evidence of drug abuse and drug-seeking behavior throughout the record. In fact, one of the doctors discharged her because she failed to come to appointments, would only fill her painkiller prescriptions by fax, and that's how she actually ended up with Dr. Easton, the doctor that they want you to believe her opinion is the doctor that she found after to do her pain medication, who apparently would be more amenable to allowing the appellant to have the drugs that she was requesting, as opposed to her prior doctor who wouldn't. So that's the lay of the land as far as the appellant herself is concerned. Now we have Dr. Easton, a doctor who, as far as I can tell, did not review any medical imaging, or at least did not note it in her records. Now, there is this October 2011 x-ray that shows a screw protruding. Just a few brief things. One, there's no evidence that Dr. Easton actually saw that x-ray that I can see in Dr. Easton's records. Two, it's a screw that's protruding into fatty tissue, so it's not even entirely clear that that would be causing pain. I mean, I'm not a doctor, but I certainly know that some fatty tissue has no nerve endings, so pain would not necessarily be coming from that. But that's something that the ALJ, to his credit, did mention, that that x-ray was in there. Three, so that's what we have. And Dr. Easton also, insofar as she did do medical examination, those examinations were generally unremarkable. Repeatedly noticed that gait and posture was within normal limits, that the appellant was able to move, et cetera, et cetera. So insofar as she did do examinations, they didn't support the opinion that she ultimately offered. And so then the ALJ says, well, look, based on this evidence, based on what it looks like Dr. Easton reviewed, that doesn't match up with her opinion. Therefore, her opinion must be based primarily on the claimant's own description of her condition. And insofar as that opinion is based on the claimant's own description of her condition, we have a thoroughly incredible claimant, and so therefore the doctor's opinion itself must be incredible as well. Now, that's a reasonable conclusion. It doesn't necessarily mean that's the conclusion that ALJ had to make, but it is the conclusion that ALJ made, and insofar as it's reasonable, this Court's bound by that conclusion. If there's no questions, I'm finished. Roberts. Great. Thank you, Mr. Burr. Thank you. Rebuttal. Neal Zentech, be hearing on behalf of the appellant, Ms. LeClaire. I want to first begin by pointing out that there is actually evidence in the record of the hip dislocation. It comes in the form of the X-rays showing the protruding hip, which happened after the dislocation. Beyond that, I wanted to point out something that one of my colleagues was struggling with a little, which was that case in Smolin, where it was a similar case where the ALJ had based his decision on a finding that the primary treating physician's opinion had to have been based primarily on subjective complaints, but rather than following through with his duty to fully and fairly develop the record, he simply made that assumption, and this Court reversed that decision, noting specifically that if the ALJ thought he needed to know the basis of the doctor's opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry. For example, by subpoenaing the physician, by submitting further questions to them, he could also have continued the hearing to augment the record. Having failed to fully develop the record, the basis for that doctor's opinion, or regarding the basis for the doctor's opinion, the ALJ couldn't reject them. I know that Your Honor said early, ask a question, what role the ALJ plays in these types of proceedings. The ALJ is actually described as not being an umpire. He's supposed to be an active participant in the fact-finding process, and he's supposed to fully and fairly develop the record for facts both for and against the claimant. Did she have counsel at the hearing before the ALJ? She did have counsel at the hearing before the ALJ, Your Honor. What do we make of the fact that maybe counsel made a considered judgment not to call Dr. Easton? You know, maybe Dr. Easton would have done her more harm than good. Well, I can't speak for her counsel in the lower court's mind, Your Honor, but. Don't we generally kind of start with an assumption that counsel knows what they're doing, unless there's some reason to think otherwise? Well, this isn't. They could have called Dr. Easton if they wanted her. This isn't an Article III type of proceeding. I don't care. What difference does it make? I'm saying they could have called her if they wanted to. I suppose he could have, Your Honor. Like I said, I can't speak for why he refused to. Okay. But maybe, you know, if she doesn't want Dr. Easton there and the ALJ doesn't want Dr. Easton there, maybe there's a reason not to have Dr. Easton there. It's entirely possible, Your Honor, and I think that under the line of cases that say that the ALJ has a duty to fairly and fully develop the record, he possibly should have pursued that line of reasoning. Is it your position that Smolin was violated in this case by this ALJ? Yes, Your Honor, it is my position that Smolin was violated in this case. And your view of the rule of law that comes from Smolin is what? What exactly is the duty of an ALJ from your perspective, your client's perspective, in this situation? What should the ALJ have done that was not done? The only thing that I'm arguing that the ALJ should have done is he should have either submitted questions to Dr. Easton's opinion or subpoenaed her so that she could testify about the basis of those opinions. Now, were that done, doesn't that flip our case law and the law of virtually every other circuit that indicates that in analyzing the opinion of the primary caregiver, that the ALJ has to look to the totality of the record, determine whether these are subjective statements, look to the credibility of the claimant, look for inconsistencies in the record. In other words, to me it seems like you've got the poor ALJ going two different directions. Is the ALJ an advocate or is the ALJ supposed to analyze? I don't read Smolin the way you do. That's why I'm asking you to tell me what you think the law is in this situation. Well, I agree, Your Honor, that there does seem to be forces pulling on the ALJ from both directions. There's another line of cases that discusses specifically that the ALJ is allowed to discount a treating physician's opinion. There are lots of them, aren't there? If it's based. There are lots of them. But during my research, most of those decisions were about psychological conditions or memorandum decisions. And the most informative of those cases was, I have it right here, Fair v. Bowen, which was a case where the ALJ actually brought the treating physician in, asked him questions, and the treating physician testified that his opinion was based purely on subjective complaints rather than on any medical evidence. Mr. Burrell says you haven't raised this argument before. Is he right about that? He is right, Your Honor. I came across this line of reasoning in a decision issued by the Ninth Circuit in mid-September. I believe it was Garcia v. Commissioner of Social Security. I set up a Westlaw alert. Okay. Now, I see that I'm quite a bit over time. If I may just briefly conclude. If you'd conclude, please. Rather than just reversing and remaining, this court also has the power to give credit to Dr. Rusin's opinion. And should you do so, you should know that after the ALJ asked what we consider to be an incomplete question to the vocational expert, Ms. LeClaire's attorney in the lower court asked a question which more accurately reflected her disabilities. You're doing more than concluding. You're making another argument. Sorry. To which the vocational expert said that she would not be employed. And you're doing it again. Thank you very much, Your Honor. Thank you very much. Mr. Burrell, thank you. The case just argued is submitted. We want to thank the University of Arizona Law students for taking this case. Dr. Jordan Curtis, thank you also. The case is submitted.
judges: Nelson, Silverman, Smith